United States Court of Appeals,

Fifth Circuit.

No. 95-20125.

In re in the Matter of the Complaint OF TOM-MAC, INC., as Owner of the M/V Marcon I, Official No. :524371, For Exoneration from or Limitation of Liability.

TOM-MAC, INC., Plaintiff-Appellee,

v.

Rosa BIELA, et al., Claimants-Appellants,

and

Julitta Jo Phillips, Movant-Appellant.

March 5, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before GARWOOD, SMITH and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

Claimants-appellants Rosa Biela, Julitta Jo Phillips, Luann Yates, and Bobby Yates (Claimants), and claimants-appellants City of Port Aransas, Urban Engineering, and James L. Urban (City Appellants), appeal the district court's grant of summary judgment in favor of plaintiff-appellee Tom-Mac, Inc. (Tom-Mac). We reverse and remand to the district court with direction to dismiss Tom-Mac's petition under the Limitation of Shipowner's Liability Act, 46 U.S.C.App. §§ 183, et seq. (Limitation Act).

## Facts and Proceedings Below

On September 4, 1992, David Biela and Claude Phillips were employed by Tom-Mac as a laborer and pile driver, respectively. They were working on the replacement of damaged pilings supporting

1

a pier owned by the City of Port Aransas, Texas, when the boom of a seventy-five-ton capacity crawler crane collapsed and killed both men.

At the time of this accident, the crane was located on a barge designated as the JR 121 (barge). This barge is a standard deck barge, 110 feet by 40 feet, with spuds. A spud is an attachment on the side of the barge through which a large, retractable pole may be inserted and driven into the seabed. The barge had been so "anchored" for at least a day when the accident occurred. In their reply to Tom-Mac's motion for summary judgment, the Claimants gave the following description of the barge, its designed use, and its function:

> "As a standard deck barge, [it] *is designed and used* for transportation of material and equipment along the inland waterways of the Gulf Coast. The barge has the attributes of a vessel—it has a raked bow, navigational lights, lifesaving equipment, pumps, and depth markings on its side. The lights on the barge, as well as the lifesaving and safety equipment, are those required by the Coast Guard. The lights are portable, which is normally the case with barges. It is the opinion of Michael Lawson, a ship's captain with over 25 years experience, and the opinion of the Captain of the Coast Guard push boat Clamp, that the JR121 is a vessel.
>
> ... The JR121 was used for transportation purposes—moving men, equipment, material, and supplies. At job sites in remote locations or where there were no loading facilities, the JR121 was used to transport all equipment, supplies, *even men, to the job site.*
>
> An example is the job in Port Aransas. There were no loading and unloading facilities at the job site in Port Aransas. The nearest facilities were in Aransas Pass, about five miles away. "Everything needed for the job' in Port Aransas was loaded on the JR121 in Aransas Pass and hauled to Port Aransas.
>
> ... The JR121 was also used to transport pilings and material during the Port Aransas job. About two weeks into the job, old pilings were put on the barge and transported from Port

2

Aransas back to Aransas Pass. When the barge arrived in Aransas Pass, it was loaded with more pilings needed for the Port Aransas job, and this material was taken back by the barge to the job in Port Aransas.... In his affidavit in support of the Motion for Summary Judgment, [president of Tom-Mac, Thomas] McMillian said that the barge was moved "short distances' during the job. At his subsequent deposition, McMillian testified that the "short distances' in his affidavit meant five miles." (emphasis added).

At the time of the Port Aransas project, the barge had on board, in addition to the crane, an air compressor, a welding machine, a diesel pile driving hammer, and a tool room. The barge did not have a bathroom nor quarters for the crew.

In its motion for summary judgment, Tom-Mac's characterization of the barge differed in at least two critical respects from the Claimants' description, above:

"It was used primarily as a work platform.... As such, the platform was *not designed* for transportation of passengers, cargo or equipment from place to place across navigable waters.

The barge served as a platform for the pulling and pile driving activities required by the contract. *It did not perform any other function* except a temporary storage facility for tools and material." (emphasis added).

In making its summary judgment proof, Tom-Mac also made a substantially different, although not incompatible, presentation of several of the facts set forward by the Claimants regarding the barge. "None of the TOM-MAC, INC. employees would travel *from one job to another* aboard the barge. The platform did not have any *permanent* navigational lights, or conventional navigation equipment. It did not have lifeboats or life rafts." (Emphasis added).

In order to move the barge during and between construction

3

projects, it was necessary to attach the barge to a contract barge or tug. At the time of the accident, the barge was attached to a tug designated as the Marcon 1 (tug). This tug was a small coastal pushboat operated by a single captain. Both the tug and the barge were under the common command of the Tom-Mac foreman of the Port Aransas project. Also, Tom-Mac bareboat chartered both the barge and the tug from the same individual. Under the charter, Tom-Mac was to provide all maintenance and repairs to the tug and the barge, as well as secure insurance coverage for both. Tom-Mac further contracted to indemnify the owner for any losses or liability caused by Tom-Mac. Tom-Mac chartered the tug in September 1991 and the barge in October of the same year.

Beginning in October 1991, Tom-Mac used the barge for jobs along the Texas Gulf Coast, including Texas City, Matagorda, Sims Bayou, Channelview, Corpus Christi, and Port Aransas. And, with the exception of a project in the Houston area, the barge and tug were used in combination on every job. The barge had no means of self-propulsion, and was therefore moved from one job to another by a contract barge. Once the barge was relocated to a new project, the tug would be employed to move the barge around as needed to facilitate the work. In describing the integrated use of the barge and tug during the Port Aransas project, Tom-Mac asserted the following:

"Once the barge arrived at the project, [the tug] was used to move the structure short distances to facilitate the construction project.

The Port Aransas "T" head project required the work platform to be moved from time to time by the [tug]. During

4

the work of removing old pilings and installing new ones, the barge *would not be moved any more than fifty feet at a given time."* (Emphasis added).[1]

Turning to the relationship between the decedents and the tug and barge, Tom-Mac asserted in its motion for summary judgment that,

> "Neither Phillips nor Biela were permanently assigned to a fleet of vessels; nor was either man *permanently* assigned to the tug known as the MARCON I. Rather, both men would be assigned to a project on an as-needed basis.... Neither Phillips nor Biela performed work which contributed to the function of the MARCON I, nor did they perform any of their duties on board the tug."

In response, Claimants presented a picture that, while not directly refuting Tom-Mac's recitation, certainly created a vastly different overall impression of this relationship between the decedents and the barge and tug:

> "Tom-Mac controls a fleet of vessels—seven combinations of tugs and barges along the Texas Gulf Coast. When Tom-Mac gets a job, it uses the closest barge-tug combination for the job. When a crew is assigned to a particular job requiring a barge-tug combination, as in the Port Aransas job, the crew is assigned "to work on the barge-tug combination'. Claude Phillips and David Biela were part of the crew assigned to the Port Aransas job."

Both parties agree that all of the work on the Port Aransas job was performed "on the water," and not on shore.

On October 4, 1992, Rosa Biela, decedent David Biela's mother, filed an action against Tom-Mac under the Jones Act in the 94th District Court of Nueces County, Texas. On October 23, 1992, Tom-Mac filed an answer to this claim, pleading the Limitation Act as

---

[1]This statement arguably contradicts the Claimants' account, *supra,* of Tom-Mac's use of the barge, two weeks into the project, to transport supplies between Port Aransas and Aransas Pass.

5

a defense.

On November 23, 1992, Julitta Phillips, decedent Claude Phillips' wife, filed her own action against Tom-Mac in the 94th District Court. On December 9, 1992, Tom-Mac filed its answer to this lawsuit, again pleading the Limitation Act.

Then, on April 6, 1993, Rosa Biela non-suited her action and filed a plea in intervention in Julitta Phillips' action. The next day, Tom-Mac filed an answer to this plea, again pleading the Limitation Act as a defense.

On March 10, 1994, Rosa Biela and Julitta Phillips amended their petition to allege that the decedents had been employees of Tom-Mac and "members of the crew of the [tug]."[2] In her original petition, Phillips had alleged in this respect only that, on the occasion in question, "Tom-Mac was the owner and operator of a fleet of vessels used in furtherance of its business", and that, at the time of the incident, Claude Phillips was a Tom-Mac employee and a "member of the crew of the barge JR121," a barge which was allegedly unseaworthy.

On June 20, 1994, Tom-Mac filed its petition in the district court below, seeking protection under the Limitation Act for the

_____

[2]This amended petition also alleged that Tom-Mac was the "owner and operator of a fleet of vessels" of which (at least inferentially) the tug and barge were a part, that the tug was used to move the barge to and at the work site, and that Tom-Mac was guilty of negligence proximately causing the death of decedents by, among other things, "failing to maintain the barge and its appurtenances in a seaworthy conditions [sic] and reasonable state of repair" and "failing to provide its employees working on the unguarded decks of the barge with a U.S. Coast Guard-approved work vest or buoyant vest."

tug.  Tom-Mac stated in its petition that "not more than six months have elapsed since Tom-Mac, Inc. received written notice of claim alleging that the Plaintiffs were members of the crew of the [tug]."

The City Appellants then joined the action in order to contest Tom-Mac's limitation of liability claim and to assert claims for contribution and indemnity against Tom-Mac.

Claimants filed a motion to dismiss Tom-Mac's limitation of liability action, and the district court took this motion under advisement on September 19, 1994.  In support of this motion, Claimants (1) alleged that Tom-Mac's petition was untimely, and (2) asserted their willingness to stipulate that the tug alone was not at fault and that Tom-Mac should therefore not be allowed to limit its liability to a vessel that was not solely at fault.

On September 29, 1994, Tom-Mac filed a motion for summary judgment in the district court, alleging that the barge was not a vessel under the Jones Act as a matter of law.  The Claimants filed a reply on October 19, 1994.  Without ruling on Claimants' motion to dismiss, the district court granted Tom-Mac's motion for summary judgment and dismissed the appellants' claims on November 21, 1994. The Claimants then filed a motion to reconsider with the district court, which was summarily denied on February 8, 1995.

The Claimants and City Appellants now appeal the district court's grant of summary judgment.

### Discussion

Jurisdictional questions are questions of law, and thus

7

reviewable *de novo* by this Court. *In re Moody,* 41 F.3d 1024, 1026 (5th Cir.1995). The fact that this is an admiralty case does not change the standard. *E.A.S.T., Inc. of Stamford, Conn. v. M/V Alaia,* 876 F.2d 1168, 1171 (5th Cir.), *reh'g denied,* 881 F.2d 1071 (1989). Mixed questions of fact and law are also reviewable *de novo. Walker v. Braus,* 995 F.2d 77, 80 (5th Cir.1993). If the district court resolves any factual disputes in making its jurisdictional findings, the facts expressly or impliedly found by the district court are accepted on appeal unless the findings are clearly erroneous. *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981).

In their motion to dismiss, Claimants asserted that Tom-Mac's limitation of liability action was not timely filed, thus challenging the district court's jurisdiction to hear Tom-Mac's petition. In pertinent part, the Limitation Act provides that:

> "The liability of the owner of any vessel, whether American or foreign ... for any act, matter, or thing, loss, damage ... shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 U.S.C.App. § 183(a).

Specifically at issue is the six month window within which vessel owners seeking such limitation of liability must petition the district court for relief:

> "The vessel owner, within six months after a claimant shall have given to or filed with such owner written notice of claim, may petition a district court of the United States of competent jurisdiction for limitation of liability within the provisions of this chapter ..." 46 U.S.C.App. § 185.

In the present case, Tom-Mac petitioned the district court for

8

limitation of liability on June 20, 1994. In its petition, Tom-Mac asserted that "not more than six months have elapsed since [it] received written notice of claim alleging that the Plaintiffs were members of the crew of the [tug]." It is undisputed that Claimants did not expressly allege that decedents were members of the tug crew until March 10, 1994, when Claimants amended their claim under the Jones Act in state court. Claimants did, however, bring actions against Tom-Mac in Texas state court in October and November of 1992, to which Tom-Mac promptly responded. The state court action brought by Julitta Phillips in November of 1992, in which Rosa Biela intervened in April 1993, identified Tom-Mac as being on the occasion in question the owner and operator of a fleet of vessels, among which was the allegedly unseaworthy barge where the accident occurred.

Tom-Mac's contention that its June 20, 1994 petition was timely filed in the district court is grounded on the principle that written notice of a claim sufficient to begin the interval is one which reveals a "reasonable possibility" that the claim made is one subject to limitation. *Complaint of Morania Barge No. 190, Inc.,* 690 F.2d 32, 34 (2nd Cir.1982). Based on this, Tom-Mac maintains that, while Claimants' March 10, 1994 *amended* complaint sufficed to give Tom-Mac "written notice" under *Morania Barge,* nevertheless Julitta Phillips' (Phillips) complaint of November 23, 1992—in which Rosa Biela intervened—revealed no "reasonable possibility" that the claim fell within the Limitation Act *because* there was no "reasonable possibility" that the barge was a "vessel"

9

under the Limitation Act.[3]

We find that the November 1992 state court complaint clearly raised a "reasonable possibility" that the Limitation Act was implicated as to the barge. First, the damages alleged by Phillips in her 1992 complaint far exceeded the value of Tom-Mac's interest in the barge and tug. Second, Phillips' 1992 complaint expressly put Tom-Mac on notice that: (1) it was being sued as a result of the accident that occurred on September 4, 1992, in the course of its operations at the Port Aransas pier and in which two of its employees were killed in the course of their employment; and (2) a "fleet of [Tom-Mac's] vessels" was allegedly involved in this accident. Third, Tom-Mac maintains that these allegations failed to provide it with the requisite notice that there existed a "reasonable possibility" that the Limitation Act was implicated by the 1992 state court petitions *because* the barge was not a "vessel" under the Limitations Act. However, considering the actual uses and physical characteristics of this barge, we find that there was clearly a "reasonable possibility" that the barge was a "vessel" under the Act.[4] Finally, it appears that Tom-Mac must have

_____

[3]The issue regarding claimants' attempted stipulation—that the tug was not alone at fault—turns on the more comprehensive question of whether or not Phillips' state court petition of November 23, 1992, raised a "reasonable possibility" that the Limitation Act was implicated as to both the barge and the tug.

[4]In *Matter of Sedco, Inc.,* 543 F.Supp. 561 (S.D.Tex.1982), *partially vacated on other grounds,* 610 F.Supp. 306 (S.D.Tex.1984), the court enumerated the following criteria for determining whether a craft is a "vessel" under the Limitation Act:

"First, the craft must be built with the intent that it

10

resolved this question differently in late 1992, as it is undisputed that Tom-Mac pled the Limitation Act as a defense to: (1) Rosa Biela's (subsequently non-suited) Jones Act claim of October 4, 1992; (2) Julitta Phillips' Jones Act claim of November 23, 1992; and (3) Rosa Biela's April 6, 1993, plea in intervention.[5]

---

be used in navigation as a means of transportation. Second, the contrivance must not be permanently attached to the shore or seabed. Finally, the craft must be subject to the perils of the sea." *Id.* at 571.

In *Matter of Talbott Big Foot, Inc.,* 854 F.2d 758, 760 (5th Cir.1988), this Court affirmed that *Matter of Sedco* set out the test for determining whether a craft is a "vessel" under the Act. Considering the undisputed evidence that the barge had a raked bow, navigational lights, lifesaving equipment, pumps, and depth markings on its side, as well as the uncontroverted proof that the barge was generally used by Tom-Mac for transportation and was used on at least one occasion during the Port Aransas job to transport rubble back to Aransas Pass and pick up supplies for the project, it is evident that there existed a "reasonable possibility" that the barge was a "vessel" under the Limitation Act.

[5]In *Vatican Shrimp Co., Inc. v. Solis,* 820 F.2d 674 (5th Cir.), *cert. denied,* 484 U.S. 953, 108 S.Ct. 345, 98 L.Ed.2d 371 (1987), this Court observed that:

"[The Fifth Circuit] has not previously addressed the first question that Vatican Shrimp raises; that is, under what circumstances does a federal court have jurisdiction to adjudicate a contested claim for limitation of liability when the shipowner has pled limitation defensively in a properly filed state court answer." *Id.* at 676-677.

*Vatican Shrimp* involved an injured seaman who filed a Jones Act claim in Texas state court. In its state court answer, Vatican Shrimp raised the defense of limitation of liability. This Court concluded that:

"There is no question that Vatican Shrimp failed to comply with the six-month time limit. Its defensive pleading of limitation in the state court answer did not toll the six-month filing period under section 185;

11

We conclude that—based on the undisputed facts presented in this case—the Claimants' 1992 state court petitions gave Tom-Mac notice of a "reasonable possibility" that a claim subject to the Limitation Act had also been made against the tug; therefore, Tom-Mac's petition of June 20, 1994 to limit its liability was likewise untimely as to the tug.

While it does appear that the Claimants' state court petitions failed to expressly allege that the decedents had been "members of the crew" of the tug until they amended their joint petition in March 1994, the facts of this case nevertheless demonstrate that Tom-Mac had sufficient notice that the Claimants' allegations implicated the tug to "trigger" the Limitation Act's six-month statutory time bar in November of 1992. First, Phillips' petition of November 23, 1992—in which Rosa Biela intervened in April of 1993—alleged, among other things, that Tom-Mac was the owner and operator of a fleet of vessels, including the barge, that on the occasion in question were in operation in furtherance of Tom-Mac's business at the time of the accident. Second—turning to the undisputed summary judgment evidence—both the tug and the barge were under the common command of the Tom-Mac foreman of the Port Aransas project. Third, both the tug and the barge had been bareboat chartered by Tom-Mac from the same owner under the same basic terms. Finally, at the time of the accident, the tug and barge were "hooked-up" so as to facilitate any movement of the

nor did the state court answer provide the federal court with jurisdiction to hear the limitation claim." *Id.* at 679.

12

barge that might be necessary at the job site.

Where vessels are owned by the same person, engaged in a common enterprise, and under a single command, this Court has applied the "flotilla doctrine" to require—for limitation of liability purposes—the owner's tender of all of the vessels in the flotilla, or the value thereof, pending resolution of the underlying claims. *Cenac Towing Co., Inc. v. Terra Resources, Inc.,* 734 F.2d 251, 254 (5th Cir.1984). This Court has recognized that, "A tug and her barge in tow were treated [for purposes of the flotilla doctrine] as a single vessel, *because owned in common and engaged in a common enterprise ...*" *Id.* at n. 4 (emphasis in original). Under the Limitation Act, where there is a "complete transfer of possession, command, and navigation" of a vessel from an owner to a "charterer," the charterer is deemed to be an owner of the vessel. *Id.* at n. 3.

Consequently, as the Claimants' 1992 state court petitions served to give Tom-Mac notice that the barge and tug were both implicated, there is no merit to Tom-Mac's suggestion that the Claimants' amended petition of March 10, 1994, constituted a new or separate claim, sufficient to "restart" the six-month window for filing under the Limitation Act. It is clear that the Claimants' 1994 amended petition was based upon the same accident, and had the same parties, seeking the same damages from Tom-Mac (as the same decedents' employer) for the same injury, as the original 1992 petitions. It appears that the Claimants' purpose in filing the amended petition was simply to expressly clarify that their seaman

13

status allegations also involved the tug, a part of the same flotilla. The Ninth Circuit has observed that shipowners have only a single opportunity to seek the protections of the Limitation Act once they have notice that a claim "with respect to the matter in question" has been made; subsequently filed claims "with respect to the matter in question" do not initiate the running of a new six-month period. *Esta Later Charters, Inc. v. Ignacio,* 875 F.2d 234, 237 (9th Cir.1989). We find the Ninth Circuit's approach to this issue to be appropriate in the particular circumstances of the present case, where the change as between the claims is so very minimal.[6] Therefore, based on this record, the Claimants' 1994 amended petition did not trigger a new six-month limitation period as to either the barge or the tug.

## Conclusion

For the foregoing reasons, we reverse and remand to the district court with direction to dismiss Tom-Mac's petition under the Limitation Act.

REVERSED AND REMANDED.

---

[6]We do *not* decide whether we would apply *Esta Later Charters* to claims by different persons for different injuries, as was the case there. Very different considerations may be involved in such a situation. For example, the first claim may be trivial and for an amount much less than the value of the vessel. *See Morania Barge* at 34-35. We note that here it is obvious that the claims were always for much more than the combined value of the tug and the barge.

14